UNITED STATES of America,
Appellant,

v.

Jonathan R. EDWARDS, Jr., Sheriff of
Rankin County, Mississippi,
Appellee.

No. 21036.

United States Court of Appeals
Fifth Circuit.

June 18, 1964.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Harold H. Greene, Bernard J.

Haugen, Alan G. Marer, Attys., Dept. of Justice, Washington, D. C., Burke Marshall, Asst. Atty. Gen., D. Robert Owen, Atty., Dept. of Justice, Washington, D. C., for appellant.

W. E. McIntyre, Jr., Brandon, Miss., Will S. Wells, Asst. Atty. Gen., Peter S. Stockett, Spec. Asst. Atty. Gen., Joe T. Patterson, Atty. Gen., William A. Allain, Asst. Atty. Gen., of the State of Mississippi, Jackson, Miss., for appellee.

Before BROWN, MOORE * and GEWIN, Circuit Judges.

GEWIN, Circuit Judge:

The United States (appellant) filed a complaint and a motion for a preliminary injunction in the U. S. District Court for the Southern District of Mississippi under Part IV of the Civil Rights Act of 1957 [1] against Jonathan R. Edwards, Jr., Sheriff of Rankin County, Mississippi (appellee). The complaint alleged that the appellee had "threatened, intimidated, and coerced and attempted to threaten, intimidate, and coerce non-registered Negro citizens of voting age in Rankin County for the purpose of discouraging them from registering to vote and from voting for candidates for federal office." Factually, the complaint charged that appellee struck and beat a Negro named Grim who was standing in the Circuit Clerk's Office waiting for two other Negroes to finish registering to vote, and at the same time, two other people, believed to be the appellee's deputies, struck two Negroes who were registering. The complaint further charged that "On February 1, 1963, and continuing to the time of the filing of this complaint, the defendant threatened, intimidated, and coerced and attempted to threaten, intimidate, and coerce non-registered Negro citizens * * *." The preliminary injunction was sought on the basis of the described incident and the allegation that, "The defendant will, unless enjoined by this Court, continue to engaged in acts and practices similar to those set forth in this complaint." The complaint was not filed until May 6, over three months after the incident complained about. A hearing was held, evidence taken, and the preliminary injunction was denied.

Briefly summarized, the trial court found: The mentioned assault and battery occurred on the last day for the payment of taxes without a penalty and the Sheriff, who collects taxes in Mississippi, was busily engaged serving citizens who waited until the last day to pay their taxes, and the Sheriff's Office was heavily burdened with telephone inquiries. It was necessary for the Sheriff to go to the Registrar's Office across the hall repeatedly, to examine records to ascertain in which precinct taxpayers resided and to answer numerous inquiries on the final day for the payment of taxes. Grim was already a registered voter but he accompanied two other Negroes, Davis and Carr, to the Registrar's Office and was a spectator while the latter two were registering. The Registrar's Office was small and crowded, and because of the crowded condition the door to the office was kept closed to allow more space. Grim stood inside of the office with his back to the door and it was necessary for him to move in order for the door to be opened. On several occasions before the incident in question, when the Sheriff and other persons entered the Registrar's Office on official business it was necessary to request Grim to move. Finally the Sheriff asked Grim to come out of the office and be seated on benches in the hall. Grim failed or refused to do so and the assault and battery occurred. Grim was required to obtain medical attention but his wounds were not serious. The two other Negroes, Davis and Carr, were working on their applications to register and did nothing to provoke any assault or battery. But while the Sheriff was ejecting Grim from the office, a sheriff's deputy, J. B. Collum,

---

* Of the Second Circuit, sitting by designation.

1. 42 U.S.C.A. § 1971.

"excitedly entered the Registrar's Office and started striking these two Negroes who were registering." The Court concluded that the deputy was not truthful in his statement of the occurrence and that his participation in the assault and battery on Davis and Carr resulted because he was "vexed at the crowded condition in the Registrar's Office and officiously entered the office without justification and vented his feelings upon these two Negroes who just happened to be registering at the time." One of the Negroes informed the Court that he had not since tried to register, but that he was not afraid to return to register, and that such an incident probably would not happen again. The Court concluded that the difficulty had no connection with the subject of registration, the assaults and batteries were not planned, were not intended to interfere with registration, were an isolated occurrence, and that there was no reasonable justification to believe that such an incident would ever occur again. As a conclusion of law, the Court stated:

"It is the considered judgment of this Court that an injunction would not be proper on account of this past event because the Court is satisfied that it will not happen again. It is purely a local grievance for which these Negroes are probably entitled to redress for the acts of this deputy but injunctive relief is not suggested."

Agents of the Federal Bureau of Investigation were notified of the foregoing facts immediately and pictures of Grim were taken the following day, on February 2, 1963. The record demonstrates that the United States was informed of the events complained about within four or five days following the occurrence. The complaint was filed on May 6, a hearing on motion for preliminary injunction was heard on May 18 and concluded on May 25. Findings of fact and conclusions of law were filed on July 23 and an order denying the injunction was entered on August 6, 1963. Notice of appeal was not filed until October 2, 1963.

The Government states in its brief, with reference to cases under the Civil Rights Statute, that proof of the following is necessary:

"This statute, then, requires proof of two ultimate facts: (1) that there was an intimidation, threat or coercion or an attempt to intimidate, threaten or coerce; and (2) that the intimidation was for the purpose of interfering with the right to vote."

While in effect conceding that Federal Rule of Civil Procedure 52(a) is applicable to our review, the Government launches a two-pronged attack against the findings of the trial court and contends that the testimony of the appellee, Edwards, is not credible because he is (a) unworthy of belief, and (b) "his testimony was inherently incredible." [2] In support of its argument the Government contends that the testimony of Edwards should be rejected in toto, and if so the inferences drawn from the evidence, and the conclusions reached by the trier of the facts cannot be supported. Much emphasis is laid on background, purpose, motive, intent, and design, and it is suggested that where such factors are involved there is in effect an exception to the "clearly erroneous" rule. As to the preliminary injunction, it is contended that there was a causal connection between the voter registration efforts and the beatings, and if so, "there is no reason for believing that this will not recur." [3]

2. The Governments asserts in its brief: "We submit that the court was clearly in error when it accepted Edwards' testimony for two reasons: First, Edwards was shown to be unworthy of belief. Second, his testimony was inherently incredible."

3. The following is from the Government's brief:
"However, if we are correct in our preceding arguments—that there is a causal connection between voter registration efforts and the beatings—then the district

In reaching our decision we must decide whether the Court was clearly erroneous in its findings of fact, and whether the Court abused its discretion in denying the motion for a preliminary injunction. We affirm.

■■■ As to the facts and the credibility of the witnesses we find nothing in the record which should cause us to depart from Rule 52(a). Credibility is to be determined by the trier of the facts, and a review of the record convinces us without question, that the facts found by the trial judge are supported by substantial evidence. The same rule applies in the determination of motive, purpose, design, or intent, because such determination is dependent upon the evidence before the trial court and the credit which the trier of the facts gives to the witnesses and the evidence. Such determinations are not to be tried by us *de novo*. This issue was settled in United States v. Yellow Cab Company, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949):

"Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them. If defendants' witnesses spoke the truth, the findings are admittedly justified. The trial court listened to and observed the officers who had made the records from which the Government would draw an inference of guilt and concluded that they bear a different meaning from that for which the Government contends.

"It ought to be unnecessary to say that Rule 52 applies to appeals by the Government as well as to those by other litigants. There is no exception which permits it, even in an antitrust case, to come to this Court for what virtually amounts to a trial de novo on the record of such findings as intent, motive and design."

See also the recent decision of this Court in United States of America v. Board of Education of Greene County, Mississippi, (5th 1964) 332 F.2d 40.

■■■ As to the preliminary injunction, it is enough to say that the universal rule is that the granting or denying of a preliminary injunction rests in the sound discretion of the trial judge. The action of the trial court will not be disturbed on appeal unless there is a clear abuse of discretion. The rule is succinctly stated in Meccano v. Wanamaker, (1919) 253 U.S. 136, 40 S.Ct. 463, 64 L. Ed. 822:

"The correct general doctrine is that whether a preliminary injunction shall be awarded rests in sound discretion of the trial court. Upon appeal, an order granting or denying such an injunction will not be disturbed, unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion."

Even though irreparable injury may result to the plaintiff in the granting or refusal of preliminary injunctive relief, the judicial discretion of the trial court is not removed, and parties are not entitled to such relief as a matter of right. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1943).[4] Discretion in granting or refusing preliminary injunctions has been entrusted by the law to trial courts. Unless the proof clearly establishes an abuse of that discretion,

court's subsidiary reason for denying the injunction falls as well. For if indeed the Negroes were beaten as an act of intimidation there is no reason for believing that this will not recur."

4. The following is from the opinion:
"The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. Compare

Scripps-Howard Radio, Inc., v. Federal Communications Comm., 316 U.S. 4, 10, 62 S.Ct. 875, 880, 86 L.Ed. 1229 [1234], and cases cited. Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction."

we must affirm. J. M. Fields of Anderson, Inc. v. Kroger Co., (5th 1962) 310 F.2d 562; Shuttlesworth, et al. v. Connor, et al., (5th 1961) 291 F.2d 217; Bancroft & Sons Co. v. Shelley Knitting Mills, (3rd 1959) 268 F.2d 569; Burton v. Matanuska Valley Lines, (9th 1957) 244 F.2d 647, 17 Alaska 298.

The theory of the Government's complaint is not based alone upon the single occurrence when the assault and battery took place on February 1, 1963, but it is alleged that the threats, intimidation, coercion, and the attempts to threaten, intimidate, and coerce continued from February 1 until the time the suit was filed on May 6, 1963—a period of three months. It is further alleged in the complaint that the defendant will continue to engage in similar acts and practices as those which occurred on February 1, 1963, unless enjoined by the Court. Not another single incident, or any threat whatever is shown by the record. The Government relies on United States v. Wood, (5th 1961) 295 F.2d 772, and points to that case as authority where a single incident was involved. We cannot agree with the Government's interpretation of the Wood case because in that case the granting of injunctive relief was sustained on the theory that the *continued* prosecution of the Negro was designed to, and would intimidate qualified Negroes, attempting to vote.

██ In its brief, the Government states that Edwards' term of office as Sheriff expired in early January, 1964. The proof in this case demonstrates only one occurrence and fails to prove a recurrence or a likelihood of a recurrence of the acts and practices complained about. In such circumstances we cannot hold that the trial court abused its discretion.

United States v. W. T. Grant, (1952) 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303.

While not determinative of this case, the record clearly shows that the trial judge gave the appellant every opportunity to present all relevant evidence, including an examination of the voter registration records for the purpose of determining whether appellee's action had an adverse effect on Negro voter registration. An examination of the records was made but no evidence with respect to what the records revealed was presented to the Court.

Upon a careful review of the entire record we cannot say that the findings and conclusions of the trial court are clearly erroneous, or that the trial court abused its discretion in denying preliminary injunctive relief.

The record in this case demonstrates conduct on the part of the Sheriff and more specially on the part of the Deputy Sheriff which we do not approve. Nothing said in this opinion should be interpreted as giving any sanction or comfort to either one of the officers involved.[5]

The judgment is Affirmed.

JOHN R. BROWN, Circuit Judge (dissenting):

First, although this is nominally an appeal from a denial of a preliminary injunction, I think this is a case which should be treated as though the "trial" on the permanent injunction had been held. The facts concerning the underlying occurrence will be the same. All of such facts were fully developed. Nothing new will be added. This approach reflects the view many times declared by this Court that where a further full trial is needed to develop the critical facts, the Trial Court should proceed

---

5. The following excerpts are from the opinion and findings of the District Court: "There was no reason for such highhanded acts on the part of the deputy on this occasion but his activity was not any planned course of action and was and is a mere isolated instance of officiousness on the part of a deputy who has little regard for veracity in his sworn statements.
\* \* \* \* \*

"Because of the false testimony of the deputy, his entire testimony has been disregarded by the Court as unworthy of belief or consideration. \* \* \* It is purely a local grievance for which these Negroes are probably entitled to redress for the acts of this deputy but injunctive relief is not suggested."

with the hearing on the merits even though appeal has been taken from the grant or denial of a preliminary injunction. United States v. Lynd, 5 Cir., 1963, 321 F.2d 26; 5 Cir., 1962, 301 F.2d 818; Wooten v. Ohler, 5 Cir., 1962, 303 F.2d 759, 760; Barnwell Drilling Co. v. Sun Oil Co., 5 Cir., 1962, 300 F.2d 298. Where there is really nothing more to try, the product of the initial and only trial ought not to acquire any artificial immunity because it nominally is a preliminary, not permanent, ruling.

Second, I need not quarrel with the facts found or the inferences to be drawn. In their naked, raw, undisputed form, they are shocking. The Sheriff of this Mississippi County beat up a Negro at the entrance to the voter registration office while two other Negroes—who were inside trying to register—were being struck by two of the Sheriff's deputies.

Worse, from the witness stand, the Sheriff, a large, tall person in contrast to his small victim, openly boasted that "I struck [Grim] just as many times and fast as I could." It was no act of self defense. His words made it plain that it was brutal retaliation for Grim's insistence that he was entitled to be there with his friends who were attempting to register. The Sheriff went on to testify: " * * * and when I slapped him down the first time, the next time I hit him I knocked him down and he fell here and I got in on him, and I don't know how many times I hit him, just as many as I could in the short interval of time I had * * *." The Sheriff's purpose was clear and his method effective: "I hit him and kept on hitting him * * *. And if he hadn't run I would have kept on hitting him." His tools were likewise ample. Rejecting the Sheriff's denial that he used anything but his hands, the Judge found that the "Sheriff struck Grim * * * with a black jack."

More than that, the Sheriff's story embraced that of his Deputy J. B. Collum whose testimony was branded as outright perjury by the District Judge. Witness after witness identified Deputy Collum as one of the persons who beat up Davis and Carr. Yet, as the District Judge found, "He [Collum] had the audacity to deny even being present when the Negroes were assaulted * * *." Of this the Judge judicially declared, "It it perfectly apparent to the Court that this deputy falsified such statement without any excuse or justification therefor."

On the undisputed record, it is a shocking case of Mississippi officials without legal justification engaging in brutal violence against Negroes. Its purpose and effect must also be judged in the light of the willingness of some to be indifferent to the truth or the oath to testify truthfully. Whether, as was true in Wooten v. Ohler, 5 Cir., 1962, 303 F.2d 759, 765, we would be "justified in concluding that the action toward * * * [these would-be registrants] was characteristic of the policy which the Sheriff had established for the whole [County]" is not important. What is important is the inevitable effect of this one incidence of governmental action by a governmental agent in this state whose "steelhard, inflexible, undeviating official policy of segregation" we have judicially noticed, United States v. City of Jackson, Mississippi, 5 Cir., 1963, 318 F.2d 1, 5; United States v. Mississippi, S.D.Miss., 3-judge, 1964, 229 F.Supp. 925. [No. 3312, March 23, 1964]. As we recognized in United States v. Wood, 5 Cir., 1961, 295 F.2d 772, 781, the inevitable, indeed intended, effect is to effectually discourage the exercise by Negro citizens of their rights to become registered and vote for candidates of their choice. If the courts may not interfere, we have on this record another startling example of the persons harmed being the only ones entitled to no relief. Tipton v. Socony Mobil Oil Co., 5 Cir., 1963, 315 F.2d 660, 662 (dissenting opinion), reversed mem., 1963, 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4; Mirabile v. United States, 5 Cir., 1964, 330 F.2d 676, 678 (dissenting opinion).

Third, the Court's emphasis on the relief sought is, I think, erroneous. The right of relief should not be determined by the pleadings. This would mean that only relief requested by the pleadings

may be granted. This is not the law. After a trial, the Court is bound to grant whatever relief the facts show is necessary or appropriate. F.R.Civ.P. 54(c); Smoot v. State Farm Mut. Auto. Ins. Co., 5 Cir., 1962, 299 F.2d 525; Arthur H. Richland Co. v. Harper, 5 Cir., 1962, 302 F.2d 324; Brotherhood of Railway Trainmen v. Central of Georgia Ry., 5 Cir., 1962, 305 F.2d 605; Shull v. Pilot Life Ins. Co., 5 Cir., 1963, 313 F.2d 445.

That leaves only the question whether any relief ought to be granted at this time. Again, I emphasize that the evidence at the "permanent" trial will be the same. If this had been a Fair Labor Standards Act case, 29 U.S.C.A. § 217, involving a Mississippi employer who had failed to keep records or pay the minimum wage, we would have reversed the denial of an injunction despite the promise of the offending party, "I'll be good." [1] If this had been a Mississippi employer adjudicated by the NLRB to have committed an unfair labor practice, 29 U.S. C.A. § 158(a), we would have enforced a cease and desist order even though the employer was presently in compliance with the Act and promised now to "go and sin no more." [2]

This is no case of isolated momentary violence. The violence arose because of, and was directed against, Negroes seeking to become voters in a county where the bare statistics [3] reveal the bare discrimination. When the Sheriff and his Deputy in the house of the law—the Courthouse—whip Negroes in the exercise of these fundamental rights, the effect is not hard to imagine. Nothing could be more discouraging than the fear that what happened to Grim, Davis, and Carr was the fate for others seeking this precious right. United States v. Wood, 5 Cir., 1961, 295 F.2d 772; United States v. Mississippi, S.D.Miss., 3-judge, 1964, 229 F.Supp. 925 [No. 3312, March 23, 1964]. I therefore think that the case should be reversed with directions to enter an injunction. [4]

I therefore respectfully dissent.

---

1. Mitchell v. Ballinger Paving Co., 5 Cir., 1962, 299 F.2d 297; Mitchell v. Pidcock, 5 Cir., 1962, 299 F.2d 281; Mitchell v. Jax Beer Distributors, 5 Cir., 1961, 290 F.2d 24; Goldberg v. Cochrell Banana Co., 5 Cir., 1962, 303 F.2d 811; Mitchell v. Strickland Transp. Co., 5 Cir., 1959, 267 F.2d 821; Mitchell v. Hausman, 5 Cir., 1958, 261 F.2d 778.

2. N. L. R. B. v. Mexia Textile Mills, 1950, 339 U.S. 563, 567, 70 S.Ct. 833, 836, 94 L.Ed. 1067; N. L. R. B. v. Pool Mfg. Co., 1950, 330 U.S. 577, 70 S.Ct. 830, 94 L. Ed. 1077; N. L. R. B. v. Warren Co., 5 Cir., 1952, 197 F.2d 814; N. L. R. B. v. Taormina, 5 Cir., 1953, 207 F.2d 251; 5 Cir., 1957, 244 F.2d 197; cf. United

States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303.

3. With a total 1960 population (all ages) for Rankin County of 34,322 of which 37.-3% (12,702) are non-white (County and City Data Book 1962, United States Department of Commerce, Table 2, page 202), this record shows that of the adults of voting age there are approximately 112 Negro compared with 12,000 white registered voters.

4. See cases cited note 1, supra, and Evers v. Jackson Municipal Separate School Dist., 5 Cir., 328 F.2d 408; United States v. Lynd, 5 Cir., 1962, 301 F.2d 818; 5 Cir., 1963, 321 F.2d 26.